Harold David Lee **HENDERSON**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 40702.

Court of Criminal Appeals of Texas.

Nov. 8, 1967.

Rehearing Denied Jan. 10, 1968.

J. Ray Martin, Amarillo, for appellant.

Gene Compton, Dist. Atty., Thomas V. Priolo, Asst. Dist. Atty., Amarillo, and Leon B. Douglas, State's Atty., Austin, for the State.

## OPINION

WOODLEY, Presiding Judge.

The offense is burglary; the punishment, enhanced under Art. 62 P.C., 12 years.

Appellant's brief was not filed in the trial court within the time allowed by Art. 40.09 Vernon's Ann.C.C.P. in that it was not filed within 30 days after approval of the record and it is not shown that the trial court, in his discretion, authorized an additional period of time for filing it.

Appellant's court appointed counsel presents a number of grounds of error which this court may consider in the interest of justice. Art. 40.09 V.A.C.C.P.

■ He contends that the indictment states no offense in that it does not allege that the breaking and entry of the house was with intent to take "corporeal personal property," but instead alleged intent to take "corporal personal property."

We do not regard the misspelled word as fatal to the indictment. One dictionary definition of "corporeal" is "corporal." A synonym for both is "bodily." Either comes within the statutory definition of personal property under the statutes relating to theft. See Art. 1410 Vernon's Ann.P.C.; 1 Branch's Ann.P.C.2d Ed. 496, Sec. 515.

Several grounds of error are presented which relate to the contention that evidence obtained as the result of an illegal arrest and search, which appellant sought by motion to suppress, was admitted over proper objection.

Without the evidence obtained as the result of appellant's arrest the state would have been unable to prove its case.

The indictment alleged the burglary of a house belonging to Luther Junior Sanders. The evidence reflects that the house burglarized was occupied by the L J Cafe, owned and operated by Sanders, in the 400 block of West Third Street in Amarillo. The house was burglarized after Sanders closed his business at midnight on November 24, 1966. There was missing from the building the next morning the contents of the coin boxes of a coin type cigarette machine containing nickels, quarters and dimes, and a "bowling machine" which took dimes only.

Also missing was a tool referred to as vice grip pliers or "vice-grips" which Sanders testified he owned and used on the

night mentioned to turn off the burner under his dish tub; a file which Sanders testified he owned and used to sharpen his butcher knives; and a pair of needle-nose pliers which Sanders testified he had when he closed the cafe on November 24th and which he used to pull the stopper out of the drain tub.

Mr. Sanders testified that he next saw his pliers, file and vice-grips when the officers brought them down to him. Mr. Sanders identified the tools mentioned after they had been admitted in evidence as exhibits, over objection, as part of the property found on appellant's person and in his possession.

The evidence introduced by the state at the hearing before the court on the motion to suppress, and before the jury, relating to the arrest of appellant and the seizure of the property reflects the following:

Officers Ferguson and Pike, of the Amarillo Police Department, while on duty and engaged in patrolling on foot in the area comprising the 300 and 400 blocks of West Third Street, shortly after 2 A. M., noticed appellant at the northeast corner of Second and Van Buren Streets walking east. It was not known at that time that the L J Cafe Building had been burglarized.

Officer Ferguson testified before the court, in part:

"Q. Did you observe anything unusual when you observed him?

"A. Yes, sir; we observed him walking from this point to approximately this point (diagram), and this—It appeared that he was staggering, and appeared that he was drunk, or intoxicated.

"Q. Did he appear to you at that time to to have the symptoms of an intoxicated person?

"A. Yes, sir.

"Q. This was a short time after 2:15 a. m.?

"A. Yes, about 2:15 or 2:17 a. m.

"Q. I believe you also stated that you have had occasion to see numerous persons that were definitely intoxicated?

"A. Yes, sir.

"Q. Did he in your observation walk like an intoxicated person would walk?

"A. Yes, sir.

\*   \*   \*   \*   \*   \*

"A. When Mr. Henderson noticed Officer Pike and myself he started to run towards the back stairs of the Mayfair Hotel, a two-story hotel, kind of a drab yellow. He took about three steps and I hollered, 'stop and wait a minute', and he did stop here at the mouth of the stairs.

"Q. Let me ask you this—prior to your hollering at him to stop, did you notice him carrying anything?

"A. He was carrying a brown paper sack.

"Q. What were its approximate dimensions?

\*   \*   \*   \*   \*   \*

"A. About eighteen inches.

"Q. Just a regular brown paper sack?

"A. Just a paper sack.

"Q. How was he carrying it?

"A. In his right hand.

"Q. When you approached him did you have any conversation with him?

"A. As we approached him we observed the sack; we observed a pair of pliers sticking out of his rear pocket; we also observed a large lump in his right front coat pocket, which looked like it might be rocks or coin; also sticking out of his right front coat pocket was a file, about so long, eight or ten inches.

"Q. All right. Now, did you make any request of the defendant?

"A. Yes, sir.

"Q. Tell us what you said?

    *    *    *    *    *    *

"A. I says, 'what do you have in the sack?'

"Q. What was his reply?

"A. Cigarettes.

    *    *    *    *    *    *

"Q. All right—did you look in the sack?

"A. Yes, sir.

"Q. What was in the sack?

"A. Cigarettes, and some change.

"Q. Do you remember how many packages of cigarettes were in the sack?

"A. 22 packages of cigarettes.

"Q. All the same brand?

"A. No, sir.

"Q. Do you recall how many different brands there were?

"A. About six or seven different brands.

"Q. Three or four packages of each?

"A. Yes, sir.

"Q. What was the denomination of the change?

"A. I think it was thirteen dollars and fifty cents, in dimes and quarters.

"Q. Is this the same type of change, in your experience, that would be in a cigarette machine?

"A. Yes, sir.

"Q. I now hand you what is marked State's Exhibit No. 2—first of all, examine this to see if you recognize this particular instrument?

"A. Yes, sir.

"Q. Have you seen it before? (Pliers)

"Q. Tell us where you have seen it before?

"A. In Mr. Henderson's left pants pocket.

"Q. Does it have any distinguishing marks on it?

"A. It has etched marks here made by a grinder.

    *    *    *    *    *    *

"Q. Mr. Priolo) Now, tell us where on the person of Mr. Henderson you saw this pair of vice-grip pliers?

"A. In his left rear pants pocket.

"Q. Did he have anything covering the grip?

"A. Yes, his coat was over them.

    *    *    *    *    *    *

"Q. I believe you stated also that he had a file on his person?

"A. Yes, sir.

"Q. I hand you here for examination what has been marked State's Exhibit No. 3 and ask you to identify that exhibit?

"A. Yes, this is the file this man had.

"Q. You identify that as being the same file you saw that night on Mr. Henderson?

"A. Yes, sir.

"Q. We introduce this file in evidence, as State's Exhibit No. 3.

    *    *    *    *    *    *

"Q. How would you describe the particular characterics of the bulge of the coat—I believe that was his right front coat pocket?

"A. Yes, in his right hand coat pocket.

"Q. Did you later determine what was in that pocket?

"A. Yes, sir.

"Q. What were they?

"A. Dimes.

"Q. How many?

"A. Eighty-one dollars worth.

"Q. Eight hundred and ten dimes?

"A. Yes, sir.

"Q. Just for the purpose of this record, tell the Judge, can you think of some object that would be comparable in size to that lump?

"A. Soft ball or small football; just a large bulge in the pocket."

On cross-examination Officer Ferguson testified:

"Q. Now, let me ask you this question— at that time did you arrest him for being drunk, or did you arrest him for vagrancy and investigation of burglary?

"A. At that time it appeared he had been drinking, but not to the extent by my standards that he should be placed in jail for drunkenness.

"Q. Did you—then you did not file a charge against him for drunkenness?

"A. No, sir.

"Q. And the reason for that was that he was not sufficiently drunk in a public place to justify such a charge?

"A. Yes, sir.

"Q. Now then, the sole reason that you placed him under arrest was vagrancy and investigation of burglary?

"A. That is the charge that was filed against him.

"Q. That was the sole reason that you took him into custody?

"A. For vagrancy and investigation of burglary, yes, sir.

"Q. And not for drunkenness?

"A. No, sir. He was not drunk enough for that."

There was also evidence to the effect that the area being patrolled was a "high crime area" that was not well lighted.

Ordinances of the City of Amarillo enacted pursuant to Art. 14.03 C.C.P. 1965 were introduced in evidence.

Appellant testified at the hearing before the court but not before the jury. His testimony was to the effect that he obtained the cigarettes and the dimes in a dice game and that the pliers and file belonged to him. His version of the arrest was that the officer called from the alley saying "stop," and came running and "when he patted me down and found out I had the merchandise on me he said 'we got us one now.' " He denied that the officer asked him if he was unemployed or indicated that he knew anything about the pliers, file and dimes he found when the officer "patted him down."

■ We are in accord with the state's contention that the arresting officer had probable cause to detain and search appellant and that the search without a warrant was authorized by the ordinance of the City of Amarillo.

We need not decide whether the arrest was also authorized under Art. 18.22 V.A.C.C.P. to prevent the consequences of theft.

■ When the officer concluded from what he observed that appellant was drunk in a public place, it was his duty to arrest him. Daniels v. State, Tex.Cr.App., 387 S.W.2d 886.

■ The fact that the person arrested was not in fact drunk does not render his detention unlawful. The test is whether on the evidence of his own senses the offi-

cer believed that he was committing an offense in his presence. United States v. Rembert, D.C., 284 F. 996.

We commend appellant's court appointed counsel for his able presentation of the case from the standpoint of his client.

The judgment is affirmed.